## CHADBOURNE v. THE TOWN OF NEWCASTLE.

Where an individual sues the town or city for damages for the destruction of his property by a mob, under chapter 1519, Laws of 1854, it is immaterial whether the defendant could or ought to have prevented the destruction of the plaintiff's property.

It is also immaterial whether any or all of the rioters were citizens of the defendant town or city.

In such case, the destruction of the plaintiff's property would be *caused* by his illega or improper conduct within the meaning of the word "caused," as used in the statute, if without such conduct on his part the destruction would not have occurred.

It is immaterial how remote in time the illegal or improper conduct of the plaintiff was, if in fact the destruction of his property was caused by it.

The "improper" conduct referred to in this statute, is such conduct as a man of ordinary and reasonable care and prudence would not, under the circumstances, have been guilty of. And the defendant town or city will not be liable if the destruction of the plaintiff's property would not have happened, but for something said or done by plaintiff which a man of ordinary prudence, under the circumstances, would not have said or done.

CASE, brought under chapter 1519, Laws 1854, to recover damages for property destroyed by a mob.

The plaintiff kept a refreshment saloon in which he sold intoxicating

liquor and other things. His saloon, and Fort Constitution, and the town hall were within half a mile of each other in Newcastle. His property in the saloon was destroyed about ten o'clock, P. M., March 3, 1864, by a mob composed of forty or fifty soldiers, who were then a part of the garrison of the fort; the whole garrison being about one hundred men. The plaintiff testified, on cross-examination, that the soldiers had been in the habit of coming to his saloon; that he was acquainted with many of them; that most of them had got drink at his saloon at different times; that he could not say whether all of them or half a dozen of them had shaken dice there for the drinks; and that he had been a soldier at the fort during the late war, at some period before March, 1864.

Subject to plaintiff's exception, defendant was allowed to prove that plaintiff was not a town liquor agent.

In the evening of March 3, 1864, there was a political meeting at the town hall, which was addressed by a person of another town. The plaintiff had prepared ten gallons of chowder for persons who might attend the meeting, and he expected that they or some of them would come to his saloon after the meeting. He closed his saloon, leaving the chowder hot on the stove, and went to the meeting fifteen minutes before the speaking commenced. Six or seven soldiers went from the fort to the meeting, and, upon hearing certain remarks of the speaker, they hissed. The plaintiff said something to the soldiers. One of them returned to the fort. Forty or fifty more soldiers came from the fort to the town hall, and, as they entered, the plaintiff was going out. The soldiers asked if plaintiff was there, and he replied "yes."

Plaintiff testified that he thought, if they wanted trouble with him, they were too many for him, and that he went home without going to his saloon, and went to bed, and knew nothing of the riot until he was told that they had cleaned out his saloon. Immediately after the meeting the soldiers went to plaintiff's saloon and destroyed his property.

There was evidence tending to show that the remark addressed by the plaintiff to the six or seven soldiers after they hissed, was, "If you want anything, come outside of the hall and you can have it." One Tucker, who was one of the six or seven soldiers, testified, subject to plaintiff's exception, that plaintiff, after making that remark, came from the back part of the hall and sat down behind Tucker; that Tucker took off his overcoat; that plaintiff said, "I wonder what that little damned runt thinks of doing;" that plaintiff had something which Tucker thought was a knife or some weapon, and that one of the other soldiers spoke of it at the time.

Subject to plaintiff's exception, defendant was allowed to introduce evidence tending to show that the remarks of the speaker which were hissed by the soldiers, contained allusions to Forts Constitution, Warren, and Lafayette, and the words "Government pimps and Government paupers," which the soldiers understood to be applied to themselves.

In the declaration, damages were claimed for certain chattels, fixtures, and doors and windows destroyed, and plaintiff testified that he did not

own the saloon, but hired it, and that the contract of hiring was not in writing.

The court instructed the jury that it was immaterial whether the defendant could or ought to have prevented the destruction of plaintiff's property; that it was immaterial whether any of the rioters were citizens of Newcastle. To which instructions defendant excepted.

The court also instructed the jury that the destruction of the plaintiff's property was caused by his illegal or improper conduct within the meaning of the word "caused," as used in the statute, if, without such conduct on his part, the destruction would not have occurred; that plaintiff's conduct in selling intoxicating liquor and keeping it for sale, was illegal; and that, if he kept a gaming house, or challenged the soldiers to go out of the hall to fight, he was guilty of other illegal conduct; but that it was immaterial whether his conduct was, in those respects, legal or illegal, useful or injurious, unless the destruction of his property was caused by his conduct; that it was immaterial how remote, in time, the improper or illegal conduct of plaintiff was, if, in fact, the destruction of his property was caused by it; that improper conduct was such as a man of ordinary and reasonable care and prudence under the circumstances would not have been guilty of; that defendant was not liable if the destruction would not have happened but for something said or done by plaintiff which a man of ordinary prudence, under the circumstances, would not have said or done; that defendant was not liable if the destruction would have been avoided by ordinary care and prudence on the part of plaintiff; that if a man of ordinary care and prudence under the circumstances would not have said or done what plaintiff said or did at the meeting, and if, but for what he so said or did, his property would not have been destroyed, the verdict should be for defendant; that the remarks of the speaker at the meeting were immaterial, except as one of the circumstances bearing upon the question whether a man of ordinary prudence would have said or done what the plaintiff said or did. To which instructions plaintiff excepted.

Plaintiff requested the court to charge that if plaintiff said no more than he had a right to say in the meeting—no more than he had a right to say in view of the disturbance caused in the meeting—what he said was not improper; that if he did challenge the soldiers to go out to fight, inasmuch as no fight followed, this is not in law such improper conduct as the statute alludes to; and that this evidence of improper conduct is too remote from the destruction of the property to constitute the improper conduct referred to in the statute.

The court declined to give these instructions, and plaintiff excepted.

The jury disagreed; and this case was reserved for the determination of questions which will arise again at another trial.

*Hatch,* for plaintiff.

*W. H. Y. Hackett,* for defendant.

SARGENT, J. This action is brought under chapter 1519, Laws of

1854, to recover damages sustained by the plaintiff by the destruction of his property by a mob. All who engage in the mob are responsible for the damages done, and the statute above referred to makes the town or city, in which such property is destroyed, liable in certain cases also, for reasons fully considered in *Underhill* v. *Manchester*, 45 N. H. 214. But by the same chapter, section 2, it is provided that "no person or persons shall be entitled to the benefits of this act, if it shall appear that the destruction of his or their property was caused by his or their illegal or improper conduct; nor unless it be made to appear that he or they upon the knowledge had of the intention or attempt to destroy his or their property, or to collect a mob for that purpose, and, sufficient time intervening, gave notice thereof to the mayor of the city, selectmen of the town, or a justice of the peace of the city or town in which such property may be situated."

The town or city not being liable in the first instance, and only being made liable on certain conditions, the question is, as stated by the court, not whether the city could or ought to have prevented the destruction of the plaintiff's property; not whether any or all of the rioters were citizens of Newcastle or soldiers from abroad; but simply whether the destruction of the property was caused by the owner's illegal or improper conduct; or, if not, then whether he gave the proper notice in case he had notice himself long enough beforehand so that he could give the notice. These instructions were therefore correct.

The other instructions as to what is to be understood by the term "improper," used as it is in connection with the term "illegal," were substantially in accordance with the views expressed in the opinion in *Underhill* v. *Manchester*, *supra;* but it is claimed that, as the conduct of the plaintiff in that case was held to be illegal, the discussion as to the meaning of the word "improper" was only a *dictum*, and is to have no authoritative force as an authority. We have, therefore, reconsidered that point in this case. It is claimed that the word is to be treated in this connection as synonymous with the word "illegal;" or, if there is to be any distinction drawn between the two words, that "improper" is, at least, to be taken to mean something *immoral*, though not expressly forbidden by statute law. But the difficulty with that view is, that hardly any two can agree as to where the line is to be drawn between what is moral and immoral. In some communities dancing and the playing of chess, draughts, back-gammon, cards, and the like, are considered as innocent amusements and as pleasant and even profitable for the purpose of recreation, and are fashionable among all classes; in other communities, to dance, or play cards or chess, or any other game, is considered as highly immoral and wrong; and the same difference of opinion exists among the different members of the same community.

By adopting the meaning for the word, which is given to it in the instructions in this case, we have a comparatively simple definition—a rule easily comprehended—and we give to both the words used in the statute their distinct and usual meaning; "illegal" meaning something "unlawful," "contrary to law," and "improper" meaning that which is "not suitable," "unfit," "not suited to the character, time and place." In this

way full effect is given to each of the two words in their different meanings; and in this way, we think, we shall carry out more nearly the intention of the legislature in making the enactments, and furnish a rule that is easily comprehended and readily applied.

A majority of the court, therefore, hold the instructions to be correct; SMITH, J., dissenting upon the last point.

*Case discharged.*